AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br><br>VERONICA KATZ, and<br>VENNESA HERRERA<br><br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>) |

Case No.   3-20-71591 LB

**FILED**

Nov 04 2020

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___Feb. 2018 through Oct. 2019___ in the county of ___Alameda and San Mateo___ in the

___Northern___ District of ___California___ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1347 | Count One: Health Care Fraud |
| 18 U.S.C. § 1349 | Count Two: Conspiracy to Commit Health Care Fraud |
| | Max. Penalties: Counts One & Two: Up to life imprisonment; $250,000 fine or twice the gross gain/loss; 3 yrs. supervised release; $100 mandatory special assessment |

This criminal complaint is based on these facts:

See attached affidavit of FBI Special Agent Paul Yahraus

☑ Continued on the attached sheet.

Approved as to form _Christ Highsmith_
          AUSA   Christiaan H. Highsmith

Sworn to before me by telephone.

Date:   11/4/2020

City and state:          San Francisco, CA

_/s_
*Complainant's signature*

Paul E. Yahraus, Special Agent, FBI
*Printed name and title*

*Judge's signature*

Hon. Laurel Beeler, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Paul E. Yahraus, Special Agent with the Federal Bureau of Investigation (FBI) being duly sworn, hereby depose and state as follows:

## I.   Purpose of the Affidavit

1.      I submit this affidavit in support of a criminal Complaint charging VERONICA KATZ (hereinafter "KATZ") and VENNESA HERRERA (hereinafter "HERRERA") (collectively "the TARGET SUBJECTS") with health care fraud and conspiracy to commit health care fraud, in violation of 18 U.S.C. §§ 1347 & 1349 (the "Subject Offenses").

2.      Further, I submit this affidavit in support of a search warrant for evidence of the Subject Offenses, as described in Attachment B, pursuant to the protocols described in Attachment C and Attachment D, at the following locations (collectively, the "**Target Locations**"):

- **Target Location-1**: 23591 Foley Street, Hayward, CA  94545 (HealthNow's Offices, as described in Attachment A-1); and
- **Target Location-2**: 23 Pinnacle Street, South San Francisco, CA  94080 (KATZ's residence, as described in Attachment A-2).

## II.   Agent Qualifications

3.      I am an investigative or law enforcement officer of the United States, within the meaning of 18 U.S.C. Section 2510(7), and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18 of the United States Code, among other offenses.

4.      I have been employed as an FBI Special Agent since 2014. I am presently assigned to an organized crime squad within the San Francisco Office of the FBI. As part of my duties within this unit, I investigate violations of federal law, including mail fraud, wire fraud, racketeering, and money laundering.  During my employment as a Special Agent, I have participated in drug, financial, and organized crime investigations. During these investigations I have gained expertise in law enforcement techniques including the use of physical surveillance,

financial examinations of banking records, and witness interviews. I have participated in search warrants and arrests as part of these investigations.

5.     Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation.  Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.   The summaries of recorded conversations set forth in this affidavit may exist in draft form, and may include notes, edits, translations, and interpretations provided for context or for clarity by translators or investigators.  In addition, unless otherwise indicated, statements by others referenced in this Affidavit were not necessarily made to me, but may have been provided to me by someone else to whom I have spoken or whose report I have read (and who in turn may have had either direct or indirect knowledge of the statement). Similarly, unless otherwise indicated, information in this Affidavit resulting from surveillance does not necessarily set forth my personal observations, but may have been provided to me by other law enforcement agents who observed the events, and to whom I have spoken or whose report I have read.

III.   **Relevant Statues**

6.     Title 18, United States Code, Section 1347, in relevant part, makes it unlawful for any person, to knowingly and willfully execute a scheme or artifice to defraud any health care benefit program or to obtain by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services.

7.     Title 18, United States Code, Section 1349 states: "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy."

## IV.     Background: Medicare and Home Health Care Agencies

8.      Medicare is a federal government health insurance program for people who are 65 or older and certain younger people with disabilities.  The Medicare program is administered by the Centers for Medicare and Medicaid Services ("CMS").  Medicare is a "Federal health care program" as defined in Title 42, United States Code, Section 1320a-7b(f) and is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).  Different parts of Medicare cover different services; for example, Medicare Part A covers hospital and other inpatient services, while Medicare Part B covers outpatient health services, such as medical office visits, lab work, and home visits.  Individuals who qualify for Medicare benefits are referred to as Medicare "beneficiaries."  Each beneficiary is given a unique health insurance claim number ("HICN").

9.      Health care providers that provide medical services that are reimbursed by Medicare are referred to as Medicare "providers."  To participate in Medicare Part B, providers, including physicians and home health agencies ("HHAs"), are required to submit an application in which the provider agrees to comply with all Medicare-related laws and regulations, including the federal False Claims Act (31 U.S.C. §§ 3729-3733), which makes it illegal to submit claims for payment to Medicare or Medicaid that you know, or should know, are false or fraudulent.  If Medicare approves a provider's application, Medicare assigns the provider a Medicare "provider number," which is used for processing and payment of claims.

10.     A provider can submit a claim to Medicare through the mail or electronically.  Every claim submitted by, or on behalf of, a provider certifies that the information on the claim form is truthful and that the services were reasonable and necessary to the health of the Medicare beneficiary.  Medicare only reimburses providers for services and procedures that are medically necessary.

11.     Medicare Part A and Medicare Part B cover eligible home health care services, such as intermittent skilled nursing care, physical therapy, and continued occupational services.  These services, and others covered by Medicare, are commonly provided at the beneficiaries'

3

homes.  In this sense, home health care differs from care provided at health care facilities where the patient may reside or stay for extended periods, such as skilled nursing facilities and other inpatient facilities.

12.     HHAs who provide services to Medicare beneficiaries can submit claims for reimbursement to the Medicare program.  Medicare will cover home health services only if, among other requirements, (1) the Medicare beneficiary is homebound; (2) the beneficiary needs skilled nursing services on an intermittent basis, or physical, speech pathology, or occupational therapy services; (3) the beneficiary is under the care of a qualified physician; and (4) a Plan of Care (CMS Form 485) is established by a physician.

13.     In order for a beneficiary to be considered "homebound," a physician must certify that a beneficiary is "confined to the home," that is, the beneficiary must either (1) because of illness or injury, need the aid of supportive devices such as crutches, canes, wheelchairs, and walkers, the use of special transportation, or the assistance of another person in order to leave their place of residence; or (2) have a condition such that leaving their home is medically contraindicated.  In addition, there must exist a normal inability to leave the home and leaving the home must require a considerable and taxing effort.

14.     Medicare requires that the homebound determination be the result of a face-to-face consultation.  A physician must conduct the consultation, or it must be done with one of the following under the supervision of the physician: a nurse practitioner, a certified nurse midwife, or a physician assistant.  The physician must also certify that the beneficiary needs home health care, that a plan of care has been established, and that the services were furnished while the beneficiary was under the care of a physician.

15.     Medicare is generally billed for home health care services in 60-day periods referred to as "episodes."  These episodes cover the services provided by home health care in those 60-day windows.  If a beneficiary continues to require home health care, another physician certification (or "recertification") is required for each subsequent episode.

16.     In order to ensure adequate cash flow to HHAs, Medicare pays a percentage at the beginning of the episode through a request for anticipated payment ("RAP") by the HHA.  The RAP provides an initial upfront payment to the HHA, typically 50%–60% in the first and second episodes.

17.     One of the conditions an HHA must meet in order to receive a RAP from Medicare is the submission a Home Health Outcome and Assessment Information Set ("OASIS").  An OASIS is an assessment, such as a start of care (SOC), a resumption of care, or a discharge, which is performed on a patient in order to determine, amongst other things, reimbursement to the HHA by Medicare.

18.     Only specific medical professionals are authorized to complete an OASIS, depending on the type of care being assessed.  For example, for nursing care, an OASIS must be completed by a registered nurse (RN) or for any of the therapies, such as physical therapy, it must be completed by a physical therapist (PT).  Conversely, a licensed practical nurse (LPN), licensed vocational nurse (LVN), or physical therapy aide (PTA) may not complete an OASIS.

19.     An HHA such as HealthNow must be accredited to bill Medicare.  There are a number of accreditation organizations permitted to assist with the accreditation process.  Accreditation organizations are third parties that certify that the HHA is in compliance with CMS rules and regulations.  Accreditation organizations are entitled to perform random surveys to determine if they will re-accredit a particular HHA.

## IV.     Probable Cause to Believe KATZ and HERRERA Committed the Subject Offenses and That Evidence of Their Crimes Will Be Located at the Target Locations

20.     Based on records collected during this investigation and witness interviews, I have learned that in 2018 the TARGET SUBJECTS defrauded Medicare by creating fraudulent medical records and billing documentation in support of Medicare claims. The TARGET SUBJECTS used the identities of licensed medical practitioners on medical records and billing information without the practitioners' knowledge or consent and submitted such documentation

in support of Medicare claims.  The TARGET SUBJECTS worked together to recruit LVNs to conduct OASIS SOC assessments and pose as RNs during those assessments knowing that Medicare requires such assessments to be conducted by RNs and not LVNs.  The TARGET SUBJECTS induced at least one LVN to conduct unauthorized SOC assessments and fill out corresponding medical records without authorization by promising extra pay—sometimes RN-level pay—for performing these unauthorized services.  After the LVN completed the OASIS SOC assessment and completed the corresponding patient notes on HealthNow's electronic medical records system (referred to as "Kinnser"), the TARGET SUBJECTS removed the LVN's name from the corresponding documentation and replaced it with the name and signature of an RN to make the documentation appear legitimate for Medicare billing purposes.  Further, the TARGET SUBJECTS fraudulently used the identities of clinicians, such as physical therapists, to complete electronic medical record documentation to bill Medicare and private insurance companies for physical therapy services not rendered.

21.     Using fraudulent documents, the TARGET SUBJECTS billed Medicare and/or private insurance companies for services not rendered and for services completed by an unqualified practitioner in violation of Medicare requirements.  To date, the investigation has revealed that at a minimum the TARGET SUBJECTS submitted fraudulent claims resulting in Medicare paying out $124,733.89 based on those fraudulent claims.  A more thorough analysis of all fraudulent billing is pending.

22.     A review of the articles of incorporation indicate that KATZ established Personal Home Healthcare, Inc in or about 2014 and then in 2015 changed the name to HealthNow Home Healthcare (referred to hereinafter as "HealthNow").  HealthNow's articles of incorporation list KATZ as the president, Chief Executive Officer, and agent for service of process.  During the investigation, I have learned that HERRERA has been employed at HealthNow since no later than July 2016.

23.     Records submitted to California authorities dated September 22, 2015 list **Target Location-1** as the location of HealthNow's offices.  Further, on October 15, 2020, I conducted

surveillance at **Target Location-1** and confirmed that **Target Location-1** continues to serve as HealthNow's offices.

24.     Based on my review of public records database checks and in-person surveillance, I believe that **Target Location-2** is the residence of KATZ and her husband, S.K.  DMV records indicate that vehicles registered for both KATZ and S.K. have **Target Location-2** as their registered address.  Further, on October 28, 2020, in the evening, FBI conducted surveillance at **Target Location-2** and observed a vehicle registered to both KATZ and her husband, S.K., parked in front of **Target Location-2**.  FBI observed the vehicle registered to KATZ and S.K. at **Target Location-2** at approximately 6:00 p.m. on October 29, 2020, and again at 8:10 a.m. on October 30, 2018.  Further, the FBI observed two subjects matching the description of KATZ and S.K. on the driveway of **Target Location-2** at approximately 5:43 pm on October 30, 2020.

### ACHC Uncovers Evidence of Health Care Fraud at HealthNow

25.     Based on interviews and a review of relevant documents, I have learned that on August 1, 2018, the Accreditation Commission for Health Care (ACHC) conducted a Medicare accreditation site visit at **Target Location-1**.  The ACHC survey revealed that certain HealthNow medical records listed a HealthNow employee—referred to herein as Cooperating Witness-1 (CW-1)[1]—as an RN when in fact CW-1 is not and has never been a licensed RN.  The ACHC survey also indicated that HealthNow had an LVN admitting patients.  An LVN cannot admit patients; an RN must admit them.  In other words, according to the ACHC survey, an LVN—rather than an RN—was performing OASIS SOC assessments, in violation of Medicare requirements.

26.     The ACHC survey also revealed that HealthNow had billed Medicare for approximately 10 in-home physical therapy visits for a patient referred to herein as Patient-1

---

[1] The FBI has interviewed CW-1 on several occasions.  During the initial interview CW-1 made false statements to the FBI, which CW-1 later admitted to during a follow up interview.  CW-1 has no prior criminal history.  Other than the initial false statements, investigators believe CW-1 has been truthful throughout this investigation.  CW-1 is providing information pursuant to a non-prosecution agreement with the government.

when in fact Patient-1 never received physical therapy and Patient-1's doctor never ordered physical therapy for Patient-1.  Medicare billing records show that HealthNow billed Medicare approximately $1,640.00 for 10 physical therapy visits for Patient-1 that allegedly occurred in February and March 2018.

### CDPH Uncovers Evidence of the TARGET SUBJECTS' Fraudulent Conduct

27.     After the site survey, ACHC sent a complaint to CMS, who notified the California Department of Public Health (CDPH).  CDPH licenses facilities, including HHAs, to operate in the state of California.  In September 2018, February 2019, and March 2019, CDPH conducted its own site survey of HealthNow.  Based on a review of the site surveyor's field notes, other records related to the CDPH survey, and witness interviews, I have learned that CDPH uncovered evidence of the TARGET SUBJECTS' fraudulent conduct at HealthNow.

28.     During the CDPH survey, HERRERA represented herself as HealthNow's office manager and claimed to be responsible for submitting HealthNow's billing claims to CMS.  The CDPH site surveyor described HERRERA as KATZ's right-hand person.  The CDPH surveyor also explained that although HERRERA is not a nurse or a physical therapist, HERRERA tells employees—including nurses and physical therapists—which patients to visit.

29.     Also during the survey, KATZ told the site surveyor that CW-1 had represented himself/herself to KATZ as an RN when in fact CW-1 was an LVN.  Based on interviews, surreptitiously recorded conversations involving KATZ, and my review of survey field notes during this investigation, I have learned that KATZ's statement to the site surveyor was false. KATZ knew CW-1 was an LVN and not an RN.  Based on my knowledge of this investigation, I believe KATZ intentionally misled the site surveyor about CW-1 representing himself/herself as an RN.

30.     The CDPH site surveyor also asked KATZ about CW-1's name being on HealthNow SOC assessments.  Based on my training, experience, and knowledge of this investigation, I believe KATZ lied to the site surveyor when she responded to this question.  As an LVN, CW-1 was not permitted to perform SOC assessments and CW-1's name therefore

should not have been listed on HealthNow's SOC assessments.    KATZ told the site surveyor

that where HealthNow records show CW-1's name on an SOC for a HealthNow patient, CW-1

was shadowing another RN—an individual referred to herein as Cooperating Witness-2 (CW-2).[2]

CW-2 is an RN; however, CW-2 never worked for HealthNow.  As discussed in greater detail

below, I believe KATZ intentionally mislead the site surveyor.  Indeed, the CDPH surveyor

learned from CW-1 that CW-1 never told KATZ that he/she was an RN.  And in a recorded

conversation that occurred later in this investigation, KATZ told CW-1 to tell investigators that

CW-1's name was listed on OASIS SOC assessments because CW-1 had been shadowing an

RN.  In other words, KATZ later told CW-1 to provide the same story to the FBI that KATZ had

provided to the CDPH surveyor.  During the recorded conversation, however, CW-1 emphasized

that KATZ's story was not true because CW-1 never shadowed other nurses, and KATZ

admitted that her story was not true.

### KATZ Asks a HealthNow RN to Falsify Medical Records

31.    Based on witness interviews and a review of relevant documents, I have learned

that KATZ asked an individual referred to herein as Cooperating Source-1 (CS-1) to engage in

fraudulent activity while working at HealthNow.  CS-1 is a registered nurse.[3]  CS-1 was

employed by HealthNow during the September 2018 site survey described above.  During the

site survey, KATZ informed CS-1 that some of HealthNow's patient charts were missing

important information.  KATZ asked CS-1 if CS-1 would: speak to the nurse who saw the

patient, listen to that nurse describe to CS-1 what treatment the nurse provided, and then sign the

documentation as though CS-1 had seen the patient.  CS-1 refused to do so, indicating that CS-

1's medical license would be in jeopardy if CS-1 followed KATZ's plan.  KATZ responded that

CS-1 should not worry because if CS-1 ever lost his/her license, CS-1 would always have a job

---

[2] I believe CW-2 has always been truthful with law enforcement.  CW-2 has no criminal history.  CW-2 does not have any other agreements with law enforcement.

[3] To my knowledge, CS-1 has always been truthful with investigators.  CS-1 has no criminal history.  CS-1 is working with law enforcement without the expectation of any monetary reward, nor does CS-1 have any other agreements with law enforcement.

at HealthNow.

### HERRERA Misleads the CDPH Surveyor

32.     During the CDPH site survey, the surveyor tried to call CW-2, presumably to confirm KATZ's explanation, described above, that when CW-1, an LVN, saw patients during OASIS SOC assessments CW-1 was shadowing CW-2, an RN.  When the site surveyor requested CW-2's phone number, either HERRERA or KATZ told the CDPH surveyor to call CW-2 at phone number 510-365-1905 (*1905).  The CDPH surveyor called *1905 and spoke to a woman who represented herself to be CW-2.  I believe the woman using phone number *1905 and purporting to be CW-2 was actually HERRERA.  During the call, HERRERA told CDPH surveyor that she had conducted the OASIS SOC assessment in question and another nurse (presumably referring to CW-1) was shadowing her and must have signed the OASIS SOC assessment by accident.

33.     Based on my training, experience, and knowledge of this investigation, I believe HERRERA was posing as CW-2 in an attempt to legitimize the otherwise fraudulent OASIS SOC assessments, discussed above, and to deceive the CDPH surveyor, in part so HealthNow would maintain its accreditation and ability to bill Medicare.  Investigators obtained AT&T subscriber records for *1905. The records indicate that HERRERA, not CW-2, was the subscriber for *1905.  Further, I have learned that CW-2 never received a phone call from CDPH regarding an inspection at HealthNow and CW-2 never worked at HealthNow.  At one point, CW-2 interviewed for a job at HealthNow but CW-2 decided not to accept a position.

### HealthNow Billed Medicare for Physical Therapy for Patient-1 that Never Happened

34.     Based on witness interviews and a review of HealthNow medical and billing records, I have learned that HealthNow billed Medicare for approximately 10 in-home physical therapy sessions in February and March 2018 for Patient-1.  However, HealthNow never provided Patient-1 with physical therapy.  In fact, physical therapy was contraindicated for Patient-1 and Patient-1's medical state inhibited Patient-1 from partaking in any kind of physical therapy.

10

**Table 1**

| Patient | Claim Date (# of claims) | Fraudulent Medicare Claim |
|---|---|---|
| Patient-1 | April 5, 2018 (10 claims) | Physical Therapy |

**The TARGET SUBJECTS Forged Signatures on Patient Medical Records**

35.     HealthNow medical and billing records show that an RN referred to herein as Cooperating Witness-3 (CW-3)[4] electronically signed a request for physical therapy for Patient-1.  Based on witness interviews, I have learned that CW-3 never signed the request for physical therapy for Patient-1.  CW-3 is an RN who worked for HealthNow in 2018 and who provided in-home medical care for Patient-1 involving an IV treatment.  CW-3 never provided physical therapy for Patient-1.

36.     HealthNow medical records also show that CW-3 electronically signed discharge paperwork for Patient-1.  Based on witness interviews, I have learned that CW-3 did not discharge Patient-1 and did not sign the discharge summary.  Further, medical records for Patient-1 dated March 8, 2018 contained wording that appeared to have been copied and pasted from CW-3's notes from March 7, 2018.  Per CW-3, the March 8, 2018 notes did not match the kind of treatment Patient-1 would have received that day, i.e. the removal of an IV.  CW-3 believes that someone else must have affixed CW-3's signature on the HealthNow medical records described above.

37.     Based on witness interviews and a review of HealthNow medical and billing records, I have learned that HealthNow also used without authorization the electronic signature of a physical therapist referred to herein as Cooperating Witness 4 (CW-4)[5] on 2018 medical

[4] I believe CW-3 has always been truthful with law enforcement.  CW-3 has no criminal history.  CW-3 does not have any other agreements with law enforcement.

[5] I believe CW-4 has always been truthful with law enforcement.  CW-4 has no criminal history.  CW-4 does not have any other agreements with law enforcement.

records for Patient-1.  Specifically, I have learned that HealthNow medical records for 2018 listed CW-4 as Patient-1's physical therapist.  As stated above, Patient-1 did not receive physical therapy in 2018.

38.     Investigators obtained copies of HealthNow medical records containing CW-4's name as a physical therapist associated with approximately 70 patients, to include Patient-1. Based on witness interviews, I have learned that CW-4 never worked at HealthNow, never completed HealthNow medical documentation, never signed any HealthNow patient medical records, and never saw any patients for HealthNow.  Accordingly, I believe that all HealthNow patient medical documentation containing CW-4's electronic signature would be fraudulent.

**HERRERA Directs Nurse to Stop Treating Patient-1 in the Middle of an IV Treatment**

39.     Based on witness interviews, I have learned that in March 2018, HERRERA directed CW-3 to stop treating Patient-1 in the middle of Patient-1's IV treatment.  In February and March 2018, CW-3, an RN working for HealthNow, administered an IV infusion treatment for Patient-1 at Patient-1's home pursuant to a specific protocol determined by Patient-1's doctor.  At some point, HERRERA contacted CW-3 and told CW-3 that she had received orders from Patient-1's doctor and Patient-1's pharmacy to increase the transfusion rate on Patient-1. This would lessen the amount of time CW-3 had to stay with Patient-1 to administer the IV treatment.  HERRERA also requested that CW-3 leave Patient-1's residence while Patient-1 was receiving the transfusion so that CW-3 could see other HealthNow patients.  CW-3 subsequently contacted Patient-1's pharmacy, who indicated that they were unaware of any changes to Patient-1's orders, including orders about transfusion rate.  CW-3 believed HERRERA had lied to him/her.[6]

40.     Based on witness interviews, I have learned that CW-3 explained to Patient-1 that CW-3 was uncomfortable with HealthNow's request to speed up the rate of Patient-1's IV treatment.  Patient-1 then contacted KATZ at HealthNow and explained that Patient-1 did not

---

[6] CW-3 subsequently quit his/her employment with HealthNow.

12

`

approve of HealthNow's request to speed up the rate of Patient-1's IV infusions. HealthNow then terminated its relationship with Patient-1.[7]  On or about March 7, 2018, HERRERA sent CW-3 a text message indicating that HealthNow was dropping Patient-1 as a patient. CW-3 was concerned because Patient-1 still had an IV in place and CW-3 needed to finish giving care to Patient-1.

**CW-4 Declines HERRERA's Job Offer; HealthNow Uses CW-4's Personal Information**

41.     Based on witness interviews, I have learned that CW-4 earned a degree in physical therapy in approximately 2015 and interviewed for a job with HERRERA at HealthNow in July 2016.  During the interview, CW-4 provided employment paperwork to HERRERA, such as a W-2, which included CW-4's Social Security Number, and HERRERA made a photocopy of CW-4's physical therapy license.  Further, HERRERA brought CW-4 to a computer and instructed CW-4 to set up an account on HealthNow's electronic medical records system, known as Kinnser.  HERRERA provided CW-4 log-on and password information for the Kinnser system.  During the interview, HERRERA told CW-4 that CW-4 would not have a more experienced physical therapist to mentor CW-4 despite CW-4 being a newly licensed physical therapist.  Further, HealthNow could not provide CW-4 with any information about how CW-4 could contact physical therapy aides CW-4 would be working with.  At the end of the interview, HERRERA asked CW-4 to see a patient that same day.  CW-4 declined and said that he/she was unsure about accepting a job with HealthNow.  Nevertheless, HERRERA insisted that CW-4 could take home patient information and begin seeing patients immediately if CW-4 accepted the job.  HERRERA insisted that CW-4 take patient information home that day.  Several days later, CW-4 emailed HERRERA to say that CW-4 would not be accepting the HealthNow job. HERRERA sent CW-4 follow up emails.  One email asked if CW-4 would be willing to do SOC

---

[7] In connection with this episode, Patient-1 filed a complaint with the ACHC against HealthNow.  ACHC informed Patient-1 that they had located an order from Patient-1's doctor for Patient-1 to receive physical therapy.  Given Patient-1 never received physical therapy, I believe any doctor's order regarding physical therapy for Patient-1 was forged by a representative of HealthNow.  Patient-1 followed up with Medicare regarding HealthNow's physical therapy charges and learned that the charges had been reversed.

assessments for patients at CW-4's convenience.  HERRERA's second email asked CW-4 to see a patient.  CW-4 declined.  HERRERA sent another email to CW-4 asking if CW-4 had time to see a patient for HealthNow.  CW-4 did not respond.

### Medicare Fraud Involving Patient-2

42.     Based on witness interviews and a review of HealthNow medical and billing records, I have learned that HealthNow used without authorization the electronic signature of a physical therapist, CW-4, on 2018 medical records for Patient-2.  HealthNow records show that on approximately seven dates in the summer of 2018 CW-4 provided physical therapy services for Patient-2.  Medical records for six of those seven visits contain CW-4's electronic signature. HealthNow's record for the seventh visit contains CW-4's name but not CW-4's signature. Additionally, HealthNow evaluation and discharge documents for physical therapy services also contain CW-4's electronic signature.  CW-4 did not sign any HealthNow documents.  CW-4 never saw any patients for HealthNow.  CW-4 never worked for HealthNow.  In sum, billing records show that HealthNow billed Medicare for approximately nine physical therapy visits for Patient-2.  Patient-2 never received in-home physical therapy treatment from HealthNow.

**Table 2**

| Patient | Claim Date (# of claims) | Fraudulent Medicare Claims |
|---------|--------------------------|----------------------------|
| Patient-2 | August 28, 2018 (9 claims) | Physical Therapy |

### Medicare Fraud Involving Patient-3

43.     Based on witness interviews and a review of HealthNow medical and billing records, I have learned that HealthNow used CW-4's electronic signature without authorization on medical records for Patient-3.  HealthNow medical records and billing documents show that on approximately eight dates in the summer of 2018, CW-4 provided physical therapy services for Patient-3.  Additionally, HealthNow physical therapy evaluation and discharge documents contain CW-4's digital signature.  CW-4 never worked at or saw patients for HealthNow.  Based

on witness interviews, I have learned that Patient-3 has never received in-home physical therapy. Based on a review of HealthNow billing records, I have learned that HealthNow billed Medicare for approximately 11 physical therapy visits for Patient-3 that never occurred.

**Table 3**

| Patient | Claim Date (# of claims) | Fraudulent Medicare Claim |
|---------|--------------------------|---------------------------|
| Patient-3 | November 21, 2018 (11 claims) | Physical Therapy |

### KATZ Offers to Pay CS-1 to Falsely Sign HealthNow Medical Records

44.     Based on witness interviews, I have learned that KATZ offered CS-1 money to sign patient treatment records for patients that CS-1 did not treat.  When CS-1 advised KATZ that this was illegal, KATZ offered to pay CS-1 approximately $35.00 per patient that CS-1 signed-off on.  When CS-1 reiterated to KATZ that it would be illegal to do so, KATZ replied that everyone was doing it.

45.     Based on a witness interview, I have learned that in approximately September 2018, CS-1 told KATZ that CS-1 was no longer going to work for HealthNow because CS-1 found his/her name on charts for patients that CS-1 did not treat.  When CS-1 brought the matter to KATZ's attention, KATZ told CS-1 to re-fresh CS-1's computer screen.  Once CS-1 did, CS-1's name was replaced with someone else's name.  KATZ then referred to it as magic.

### HealthNow Medical Records for 200 Patients List Nurse that Never Provided Care

46.     Based on a witness interview, I have learned that CS-1 saw approximately four patients while working at HealthNow.  CS-1 saw these patients during the time period of the site surveys described above to help HealthNow pass accreditation inspection.  KATZ told CS-1 not to worry about documenting any of CS-1's patient visits; accordingly, CS-1 never documented patient visits in HealthNow's Kinnser electronic medical record system.  Further, CS-1 never

conducted an OASIS SOC assessment for a HealthNow patient nor has CS-1 signed any medical documents for HealthNow. Nevertheless, HealthNow medical and billing records list CS-1's name in connection with approximately 200 patients. Based on interviews with former HealthNow employees, I have learned that KATZ and HERRERA are the last ones to view patient charts before sending them to Medicare for billing.

### KATZ Asks CW-2 to Sign Medical Forms Without Seeing Patients

47.     Based on witness interviews and a review of HealthNow medical records, I have learned that KATZ asked CW-2 to sign HealthNow medical records for patients that CW-2 did not see or treat. No earlier than November 2017, CW-2 went to HealthNow and met with KATZ and HERRERA to discuss CW-2 working at HealthNow. During the meeting, CW-2 gave HERRERA CW-2's driver license, nursing license, and medical insurance information. CW-2 did not provide a resume at that time. KATZ indicated she needed a director of nursing and offered CW-2 a HealthNow vehicle. KATZ asked CW-2 to sign CMS-485 forms (Plan of Care and Certification forms) without actually seeing the patients because other nurses at HealthNow could see the patients. CW-2 never accepted a job at HealthNow. Nevertheless, CW-2 is shown on HealthNow patient records as a certifying RN. Accordingly, I believe that HealthNow representatives used CW-2's identity on HealthNow patient records without CW-2's authorization when CW-2 did not work at HealthNow.

### KATZ Instructs CW-1 to Represent Himself/Herself as an RN and Sign SOCs

48.     Based on witness interviews, I have learned that KATZ directed CW-1, a former HealthNow LVN, to represent himself/herself as having an RN credential when in fact CW-1 had only an LVN credential. CW-1 started working at HealthNow in approximately December 2017. Several weeks after starting, KATZ—with HERRERA in the background—called CW-1 and asked CW-1 to take off CW-1's LVN badge and put on his/her RN badge. When CW-1 said he/she did not have an RN badge, HERRERA said that it would only be for a few days and that they would send in an RN later. CW-1 understood that his/her name would not appear on patient's charts. CW-1 also understood that HealthNow was getting bigger and needed CW-1 to

help giving SOC assessments to patients.  When CW-1 told KATZ that CW-1 could not give out SOC assessments to patients, KATZ told CW-1 that it was fine.  KATZ instructed CW-1 not to put his/her name on the SOC assessments and not to sign them.

49.     Based on witness interviews, I have learned that CW-1 gave out SOC assessments to patients.  CW-1 then gave the SOC assessment packets to KATZ, who uploaded the packets and sent them to CW-1 for CW-1 to sign.  When CW-1 expressed concern about signing the SOC assessments, KATZ told CW-1 that it would be okay and to just make sure the assessment packets were correct.  KATZ promised to pay CW-1 an extra $20-$30 per patient if CW-1 would give SOC assessments to patients.  CW-1 signed what she was asked to sign.  At one point, CW-1 expressed concern to KATZ about CW-1 doing SOC assessments.  KATZ responded by saying that CW-1's name was not on the SOCs.  Later, CW-1 spoke with KATZ's husband, S.K., who said that they would pay for CW-1's schooling to become an RN.  CW-1 reiterated that he/she did not want to do anymore SOC assessments.  S.K. told CW-1 to keep doing SOCs for a few more weeks and then CW-1 could stop.  S.K. told CW-1 that CW-1 had a car (a HealthNow vehicle), extra money, and schooling.  CW-1 continued to do SOC assessments.

**KATZ and HERRERA Manipulated Medical Records**

50.     Based on numerous witness interviews and a review of HealthNow's electronic medical records, I have learned that HERRERA and KATZ manipulated HealthNow's electronic medical records on the Kinnser system.  I have also reviewed worklog audit records for HealthNow's Kinnser system that show when certain users—reflected by the username—logged into HealthNow's electronic medical record system to update medical records.  These audits records reflect when a user logged into the system and what action the user took with regard to the specific patient medical record.  I have learned that these worklog audit records corroborate CW-1's account—described herein above—of how CW-1 completed SOC assessments, provided the assessment to KATZ, KATZ loaded the SOC assessment onto HealthNow's Kinnser system, CW-1 signed the SOC assessment, and then either HERRERA or KATZ logged onto the electronic medical records system and removed CW-1's signature.  My review also indicates that

both HERRERA and KATZ appeared to log onto the Kinnser system in order to improperly enter the signature of an RN to correspond with an SOC assessment completed by CW-1. In many cases, the RN who allegedly signed the medical record either never worked for HealthNow or never completed electronic medical records for HealthNow. Therefore, based on my review of electronic medical records, worklog audit reports, and witness interviews, I have learned that KATZ and HERRERA manipulated electronic medical records submitted to Medicare for reimbursement.

51.     For example, Table 4, below, is an excerpt of a worklog audit record reflecting entries in HealthNow's Kinnser electronic medical records system for one patient SOC assessment. Table 4 indicates that on May 2, 2018, KATZ (using her UserName but the first and last name of a HealthNow RN, Brandon Lewis) created an OASIS SOC for a patient referred to herein as D.A. On May 9 and 10, 2018, CW-1 logged into the patient medical record and saved the SOC 22 times. CW-1 then submitted the document with CW-1's electronic signature. Later the same day, HERRERA logged into the patient SOC assessment, removed CW-1's signature, saved the SOC 12 times, and completed the document. On August 10, 2018, HERRERA reopened the SOC, updated task details, and completed the SOC. Approximately 27 minutes later, someone using CS-1's username signed the document. CS-1 is an RN. Based on witness interviews, I have learned that CS-1 never signed or filled out any HealthNow medical records. Further, I have learned in witness interviews that KATZ and HERRERA limited CS-1's access to HealthNow's Kinnser system. At one point, CS-1 asked about being able to access Kinnser and KATZ replied that CS-1 did not need access. Based on my training, experience, and knowledge of this investigation, I believe KATZ opened the OASIS SOC depicted in Table 4 knowing that CW-1 conducted the SOC assessment. I further believe that HERRERA deleted CW-1's electronic signature and then used CS-1's login credentials to sign the SOC assessment because HERRERA knew that CW-1 was not authorized to conduct SOC assessments and that only RNs—such as CS-1—could lawfully conduct SOC assessments.

**Table 4**

| Task Name | Action Taken | Date Action Taken | UserName | First Name | Last Name |
|---|---|---|---|---|---|
| OASIS-C2 Start of Care | Task Created | 2018-05-02 15:46:51 | vkatz.hnhhc | Brandon | .Lewis |
| OASIS-C2 Start of Care | Saved[8] | 2018-05-09 22:53:26 | [CW-1].hnhhc | [CW-1] | [CW-1][9] |
| OASIS-C2 Start of Care | Sent to QA Manager | 2018-05-10 00:34:07 | [CW-1].hnhhc | [CW-1] | [CW-1] |
| OASIS-C2 Start of Care | Submitted with Signature | 2018-05-10 00:34:07 | [CW-1].hnhhc | [CW-1] | [CW-1] |
| OASIS-C2 Start of Care | Signature Removed | 2018-05-10 14:12:58 | vherrera.hnhhc | Vennesa | Herrera |
| OASIS-C2 Start of Care | Saved[10] | 2018-05-10 14:14:01 | vherrera.hnhhc | Vennesa | Herrera |
| OASIS-C2 Start of Care | Completed | 2018-05-10 14:18:09 | vherrera.hnhhc | Vennesa | Herrera |
| OASIS-C2 Start of Care | Reopened | 2018-08-10 16:21:27 | vherrera.hnhhc | Vennesa | Herrera |
| OASIS-C2 Start of Care | Updated Task Details | 2018-08-10 16:21:36 | vherrera.hnhhc | Vennesa | Herrera |
| OASIS-C2 Start of Care | Completed | 2018-08-10 16:21:52 | vherrera.hnhhc | Vennesa | Herrera |
| OASIS-C2 Start of Care | Signed Document | 2018-08-10 16:49:41 | [CS-1].hnhhc | [CS-1] | [CS-1][11] |

[8] According to worklog records not included here for the sake of brevity, CW-1 saved the OASIS SOC 21 additional times between 05-09-2018 at 22:53:26 and 05-10-2018 at 00:34:07.

[9] CW-1's UserName, First Name, and Last Name accurately correspond to CW-1's real name in the workfile reports I have reviewed. These identifiers are redacted here to protect the confidentiality of the cooperating witness.

[10] According to workfile records not included here for the sake of brevity, HERRERA saved the OASIS SOC 11 additional times between 05-10-2018 at 14:14:01 and 05-10-2018 at 14:18:09.

[11] CS-1's UserName, First Name, and Last Name accurately correspond to CS-1's real name in the workfile reports I have reviewed. These identifiers are redacted here to protect the confidentiality of the cooperating source.

| OASIS-C2 Start of Care | Task Paid | 2019-05-31 10:17:56 | vherrera.hnhhc | Vennesa | Herrera |
| OASIS-C2 Start of Care | Exported | 2019-08-14 13:49:24 | vherrera.hnhhc | Vennesa | Herrera |

**CW-1, KATZ, and S.K. Discuss Covering Up HealthNow's Fraudulent Practices**

52.     On or about October 3, 2019, CW-1, working at FBI's direction, met in person with KATZ and S.K. at a coffee shop.  Investigators provided CW-1 with a recording device and conducted surveillance of the meeting.[12]  Based on my training, experience, and knowledge of this investigation, including my review of the recordings and recording transcripts, I believe that during the conversation, KATZ, CW-1, and S.K. discussed how to hide HealthNow's fraudulent practices when confronted by law enforcement.  Further, I believe KATZ was concerned about CW-1 making a record of the conversation.  KATZ said to CW-1: "[P]ut your phone away.  And stop writing stupid shit on your phone….Don't write anything on your phone…. [P]ut it away."

53.     Later in the conversation, based on my knowledge of this investigation, I believe KATZ acknowledged that she and HERRERA had directed CW-1 to represent herself to patients as an RN rather than an LVN.  Specifically, as transcribed below, KATZ did not deny or push back against CW-1's claim that KATZ and HERRERA directed CW-1 to falsely represent himself/herself as a nurse.  Rather, KATZ and S.K. responded to CW-1's accusation with questions about the FBI's investigation.

> S.K.: You ever told—you ever told a patient that, that you, that you were an RN?
>
> CW-1: No, because remember when I first started you [KATZ] and Vennesa [HERRERA] called me and was like, ok, you ready to take off your badge and be RN.
>
> S.K.: Uh, let me ask you—
>
> KATZ: Ok, that—

---

[12] Excerpts from the recording are provided in draft form and in part.

CW-1: Remember?

S.K.: Let me ask you something.  So in this case, when you, when you said, they [the FBI] said they talked to some patients—did they say which ones?  Or you—

CW-1: No, they just showed me different papers.

KATZ: Do you get that it's impossible for them to have called back a year—

S.K.: I don't think—

KATZ: and ask patients about specific names?  Like I can call patients that we saw two weeks ago—

54.     Based on my training, experience, and knowledge of this investigation, I believe that later in the conversation CW-1 asked KATZ to help CW-1 come up with a lie to tell the FBI to explain why CW-1's name was listed on HealthNow OASIS SOC assessments.  I believe KATZ responded by telling CW-1 say that CW-1 was shadowing an RN during the SOC assessment.  I believe KATZ was encouraging CW-1 to lie to law enforcement because KATZ knew CW-1 was not being supervised or trained by an RN when CW-1 signed the OASIS Start of Care assessments.  I further believe that after CW-1 explained to KATZ that CW-1 never shadowed any other nurses and needed a lie to cover up the illegal conduct KATZ told CW-1 to lie and say that CW-1 was shadowing HealthNow RNs Brandon Lewis and Sandra.

CW-1: No, but so why is my name on stuff [referring to SOCs]?  Like this—

KATZ: So hear me out.

CW-1: You need to tell me what to say.

KATZ: Ok.

CW-1: I don't—like, I'm freaking out.

S.K.: I don't—say, saying you didn't (unintelligible or "UI"), I worked there, I didn't do anything (UI) I don't know.

KATZ: Whatever you want to say, it's your choice, but you can always (UI), and

and tell them listen, I'm an[] LVN.  I only did follow up visits.  If I was in a home doing a start of care, it was because I was being trained and supervised by a nurse. If my—

CW-1: So I need to know which nurse, what name to say.  cause they're going to be like, which nurse?

KATZ: The only nurses that were doing supervisory visits at the time were Brandon Lewis, Sandra, and—who else did you know? Which nurses do you know that were (UI) backup?

CW-1: I don't know.

KATZ: So those are the only nurses that were present at the time.  We had—well well there was multiple.  But in the East Bay it was Brandon Lewis and Sandra.  I would stick to those, because those ones were (UI)—

CW-1: But I didn't do follow up, I didn't do any follow up.  So, who's name—

KATZ: You did lots of follow up visits.  You didn't do follow up visits?

CW-1: Nah, I mean, I didn't do shadows.  So who's name am I going to say?

KATZ: Brandon Lewis and Sandra.

55.    Based on my training, experience, and knowledge of this investigation, I believe later in conversation KATZ admitted to CW-1 that HealthNow submitted three patient charts containing CW-1's name for billing.  I believe KATZ admitted that CW-1's name should have been removed from the medical records prior to submission.  Further, KATZ explained to CW-1 that KATZ had previously told state authorities that CW-1's name appeared on OASIS SOC assessments because CW-1 was shadowing a nurse and must have accidentally signed it.[13]  I believe KATZ knew that this was a lie.  I also believe that during the conversation, KATZ acknowledged knowing that CW-1's conduct in signing SOC assessments was illegal.

KATZ: There were three charts that had your name on it that we can never fix

---

[13] As described above, KATZ told the site surveyors that CW-1's name was on SOC assessments because she was shadowing another nurse, but that time KATZ provided the name of CW-2 (who never worked at HealthNow) as the nurse CW-1 was shadowing.  In the recorded conversation, KATZ throws out a different nurse name, indicating that she is trying to cover up her directive that CW-1 improperly complete SOC assessments.

because it was billed and it was through safe survey. And somehow it was submitted or something. But we already told State, they're like, hey. We told them already, at the time when you were there-- remember I was calling you? I was like, hey, State's here? We told them that you were there doing a supervisory visit. And however you signed it, it was an error on our end. We might have put it your hotbox, and you might have accidentally might have signed something thinking it was because of pay or something else. But we were very clear with them, and the office is very clear, that you did not do any start of cares, ever. Because that would been wrong and illegal. So you have never done the start of care, and we have never billed a start of care, that you would have conducted. Because you would have never done a start of care.

56.     Based on my training, experience, and knowledge of this investigation, I believe that later in the conversation KATZ provided CW-1 with additional false explanations for CW-1 to give law enforcement to explain why CW-1 improperly signed patient records.  Specifically, KATZ told CW-1 to say that CW-1 could not keep track of HealthNow paperwork and mistakenly signed documents.  KATZ also told CW-1 to say that CW-1 was shadowing—i.e., training with—other nurses.  I believe that KATZ knew both stories were false.  In fact, as transcribed below, KATZ instructed CW-1 to say that he/she shadowed an RN after CW-1 made clear that CW-1 never actually shadowed other nurses.  Therefore, I believe KATZ knowingly provided CW-1 with a lie to help mislead law enforcement and cover up KATZ's fraud.

CW-1: …but then they [the FBI] were like, why were you signing of paperwork?

KATZ: Oh good, because you know what—

S.K.: I mean, you're going do—

KATZ: Wait hold on. You get tons of, you were seeing hundreds of patients. Easy. There's things when you people go in-- I mean, I can tell you, clinicians that an RN, a hundred times over. That things were just like sign your shit because we need to get it signed and done. And they go in, just sign it, and submit. Sign, submit. Sometimes it's late notes and we're just signing things up. Go yo, if something was plot in the hotbox, I signed. Done. If it was plotted, maybe it's because I went and I did a visit with another nurse. I was just in training. I have learned how to training on UI, I did training—

***

CW-1: But I didn't do any training.  That's what I'm saying, whose name am I

saying?

KATZ: Nurses.  Say, hey, I don't remember—

CW-1: They're going to ask to me.  They know, everything.

KATZ: Then you go, I don't remember the nurse's names.  I was not in a relationship with them.

S.K.: You were in training.  Just say, hey, I don't know, this was months ago or a year ago.  I did follow ups.  (UI).

57.     Based on my training, experience, and knowledge of this investigation, I believe that later in the conversation CW-1 presented KATZ with a formal complaint filed with CDPH against CW-1.  The complaint listed KATZ as the complainant.  After acknowledging the complaint, I believe KATZ explained that around the time of the site survey, CW-1's name had been found on a SOC assessment and KATZ and HERRERA had called CW-1 to come up with a false story to tell the CDPH site surveyor about CW-1's name being on the SOC.  KATZ explained that their story to the CDPH surveyor had been that CW-1 was visiting patients under the supervision of a HealthNow RN.  KATZ then told CW-1 that the site surveyor had asked KATZ whether CW-1 had an RN license and KATZ told the site surveyor that CW-1 was not an RN and that CW-1 had never represented himself/herself to KATZ as an RN.  I further believe that KATZ then suggested to CW-1 that KATZ never filed a complaint against CW-1.  This portion of the conversation is transcribed below.

> KATZ: Ok, I know what this is. Hold I know what this is. In August there was a patient with your name on it. And if you remember me and Vennesa [HERRERA] called and said you[r] fucking name's on it, here's what we're saying. We're telling them that you were there for a supervisory visit. And when she [the site surveyor] was there in person, we told them. The reason that her [referring to CW-1] name is there is because she was there under a supervisory visit. And I even told you that over the phone. I said this is what I'm saying. And they even asked like do you [have] an RN licensure. I said no. And they asked, like, did she ever tell she was an RN. I said no. They said did she ever show you that she has RN license. I said no. And that's it and they walked away from it. I never called and made a complaint about you….

58.     Based on my training, experience, and knowledge of this investigation, I believe that KATZ, S.K., and CW-1 then discussed how during the site survey CW-1 texted KATZ to say that CW-1 was not going to take the blame for following KATZ's directive that CW-1 fill out OASIS SOC assessments.  KATZ and CW-1 then discussed again how their cover story would be that CW-1's name was on SOC assessments because CW-1 was training with other nurses.  This portion of the conversation is transcribed below.

> KATZ: This is—they were in my office for a survey at that point.  And remember you texted me like hell no, I ain't going down—
>
> S.K.: Remember they were just visiting?
>
> KATZ: Wait, wait, wait.
>
> CW-1: Yeah, I said I wasn't going to down for it?
>
> KATZ: You're like hell no, I'm not going down, and like hell no, don't call me with that shit. Last time you tried to put-- you like you know, know you—I'm not picking up that. Kept calling the number.
>
> CW-1: Right.
>
> KATZ: Ok. At that time she was in the office and she's like why is her name on this document. And I was like, I told her I said, she must have been there doing the supervisory visit. And she's was like, oh so did you think she was an RN? I'm like, I didn't know. Maybe she was, maybe she wasn't. She was still in training-- other-- she was like, why is she doing training? I'm like, because she wants to be an RN. And then like, did she ever show that she has RN. And I was like no. Did she tell you she's an RN? I'm like no. That's all, that's all it was. I didn't complain like LVN license or anything like that.

59.     I further believe based on my training, experience, and knowledge of this investigation that later in the same conversation, CW-1, KATZ, and S.K. discussed the fact that CW-2 never worked for HealthNow, yet CW-2's name appeared on HealthNow patient medical records.  KATZ provided CW-1 with a false story to tell law enforcement if CW-1 were to be questioned about CW-2's name being on HealthNow medical records.  KATZ then admitted that HealthNow was using CW-2's personal information despite CW-2 not working for HealthNow. This portion of the conversation is transcribed below.

CW-1: And that was the other thing too, they were, they had, um, they were saying that—so they know who [CW-2] is and they were asking me if I knew [him/her].

KATZ: How would they know [CW-2] is?

CW-1: Because they had documentation with [his/her] name on it.

KATZ: On what?

CW-1: On the SOCs…. That were sent to Medicare. [C]ause they said, it's-- the same patients are attached to me and [CW-2]. So they were like, what is there-- why is there a coincidence that they're both attached.

KATZ: and what did you say?

CW-1: I don't know.  I don't know that [CW-2] worked for you, so I didn't know what to say.

KATZ: Ok, good.

CW-1: What do you want me to say though?

KATZ: What?

CW-1: Because that's you hired [CW-2] right?

KATZ: So, I hired [CW-2] to be an RN. So here's what I'm going to say: you guys stick to exactly what is the truth which is, you did not do any start of cares, you have no idea what the fuck they're talking about. Like if my name is on there, it was only because you did follow ups and were part of a chart. And be like, hey, they're fucking intake was, their intake was a fucking hot mess. They had people in and out, they were hiring people constantly with intake, they had no idea what they were doing. They might have plotted the wrong to me. There were multiple times where they would plot things (UI) frequency and I constantly tell them that they was fucking, like messed up. But I never did start of cares which is the truth. You never did start of cares, and we never billed based on you doing start of cares. We only billed what nurses went to go do. End of discussion. Everything else—

***

CW-1: So how do they know [CW-2]?  And, and what if they call [CW-2] and [CW-2]'s going to say, I never worked with them.

S.K.: Because [CW-2] was the one complaint you had, remember when she left

26

your or whatever and then she called saying she doesn't work there? And that, that state (UI) talking about [CW-2]? Do you remember that?

CW-1: M-hum.

S.K.: And then you were like here's her personnel, she was here, we actually

KATZ: We showed them all the hired people.

S.K.: Yeah. And they were like ok, and then they closed it out. I mean—

KATZ: She applied. She filled out all the hired paperwork. She was ready to start working.

CW-1: Well yeah I know that. But she never worked for you.

KATZ: She worked for me. On paper she worked for me. Do you see what I'm saying though, like—whatever—

60.     I believe, based on my training, experience, and knowledge of this investigation, that KATZ's statement—"She worked for me. On paper she worked for me"—indicates KATZ's willingness to deceive authorities and to knowingly use CW-2's identity without CW-2's authorization to complete patient medical records.

61.     Based on my training, experience, and knowledge of this investigation, I believe that later in the conversation CW-1, KATZ, and S.K. discussed a time KATZ wanted CW-1 to pretend to be CW-2 during the CDPH survey. I believe CW-1 asked KATZ if she thinks law enforcement is looking into CW-1 because of KATZ asking CW-1 to impersonate CW-2 to the CDPH surveyor. KATZ initially said she did not remember the incident, however, she did not deny the accusation and admitting to having on file CW-2 personnel records ("paperwork") even though CW-2 did not work at HealthNow. Further, KATZ responded to CW-1 accusation that KATZ had told CW-1 to impersonate CW-2 by telling CW-1 not to worry about the investigation because the investigation was closed. This portion of the conversation is transcribed below.

CW-1: … [R]emember that time the surveyor called and she-- and you were like, oh just, just make believe you're [CW-2]. I thought it was the surveyor that did that.

27

S.K.: The surveyor?

CW-1: No, Veronica. Remember the surveyor was there, and you were like, we can't find [CW-2]. Can you just make up-- make believe you're [CW-2]?

KATZ: I don't remember that. But what happened?

CW-1: When you and Vennesa [HERRERA] called me, the surveyor was there. It was like, it was probably the second time, it was like-- her name was Lisa.

KATZ: So what- so what do you think-- what was the result? You think it was what?

CW-1: Maybe the surveyor said something. Because you told me—

KATZ: No. A hundred percent no.

S.K.: Listen, they're call-- they're probably talk to like, three or four people.

KATZ: They're probably going to talk to [CW-2].

S.K.: [UI] we had her, her paperwork there.

KATZ: We have all her [UI] paperwork.

***

CW-1: But do out think the surveyor said something because she couldn't find [CW-2] and—

KATZ: No.

CW-1: --and you wanted me to act as her.

KATZ: Look at me. No. No, that survey was closed. It's done. No. No. Absolutely not. Anything that would've been open or suspended, they would've continued looking into it. I want you to listen really closely, because this really important for your license and for your fucking life. Ok, because I—for me, what the fuck. I don't have a license, ok? I'm not losing shit. If lose a company I'll start another one.

62.     Based on my training, experience, and knowledge of this investigation, I believe that toward the end of the conversation, KATZ and S.K. instructed CW-1 not to generate incriminating evidence by writing text messages to KATZ. I believe that KATZ and S.K.

instructed CW-1 to meet with them in person in order to hide evidence of their illegal activity from investigators and law enforcement.  Further, I know that individuals engaged in criminal activity commonly to erase text messages, ask others to erase text messages, or avoid text messages all together for fear of incriminating evidence of a crime being recorded.  This portion of the conversation is transcribed below.

> KATZ: I recommend you don't put anything in writing, like text messages. Anything that could be problematic…
>
> S.K.: You need to meet up, call—call me.  And I will meet, it's fine.
>
> KATZ: And just say I need to meet up with you.
>
> CW-1: Ok.
>
> S.K.: Call me.  And maybe we'll even know that our—depends on where I guess. So we'll do it the legal office where I keep (UI)
>
> KATZ: I recommend you don't write anything (UI), on text messages don't talk about anything over the phone either.  Anything that could be incriminating, don't put in writing.

**KATZ and HERRERA Confirm Their Fraud Scheme in a Second Recordings**

63.     On October 24, 2019, CW-1 met with KATZ a second time and recorded the conversation under FBI supervision.[14]  Based on my training, experience, and knowledge of the investigation, I believe that that during the conversation, KATZ admitted that it was illegal for an LVN such as CW-1 to do a SOC.  KATZ told CW-1, "…I can also tell you one hundred percent again and again and again, we would never ever tell someone that you an LVN would agree to do an SOC. And we would never … put you in that situation."  Further, I believe that KATZ's statement was an acknowledgement that CW-1 had improperly done SOC assessments and that KATZ was telling CW-1 she would never tell anyone else that CW-1 had done SOC assessments.

---

[14] Excerpts from the recording are provided in draft form and in part.

64.     During the same conversation, CW-1 confronted KATZ about CW-1's name being on OASIS SOC documents sent to third parties, including Medicare.  Referring to the FBI, CW-1 said: "they're saying that they want to know why my name is on all these SOCs that were sent to Medicare."  CW-1 continued: "why are the[y] coming to me?"  KATZ responded: "…I would protect you no matter what."

65.     Based on my training, experience, and knowledge of this investigation, I believe that later in the conversation KATZ admitted to CW-1 that CW-1 had conducted SOC assessments, that KATZ and CW-1 had an understanding that CW-1's name would be removed from electronic medical records corresponding to SOC assessments, and that a few records "fell through the cracks" because they had been submitted for billing while still having CW-1's name on them.  This portion of the conversation is transcribed below.

> CW-1: We spoke about it when I first got hired. You guys asked me to help you guys … with do, with doing SOCs. Because you didn't have enough RNs—
>
> KATZ: But why would you sign? Why would you sign it?
>
> CW-1: I don't know why it was signed.
>
> KATZ: Exactly. That's what I'm saying. Why can't you just continue—
>
> CW-1: But, why is my name on it still then? There's three that fell through the cracks.
>
> KATZ: Yes.
>
> CW-1: So how you do you know others didn't fall through the cracks?
>
> KATZ:  Because we pulled up every single chart.
>
> CW-1: But that was-- that's after. How do you know? You don't know.
>
> KATZ: We pulled up everything.
>
> CW-1: But you said that my name would not be on it.
>
> KATZ: You're right, I did…. But I can tell that those, two of those three were not even sent to Medicare.

CW-1: … [T]hen it was your bad then. It was Vennesa's [HERRERA's] bad … that my name went to freaking SOCs.

KATZ: One hundred percent.

66.    Based on my training, experience, and knowledge of this investigation, I believe that during the same conversation, KATZ repeated her cover story for why CW-1 conducted SOC assessments—that CW-1 only conducted SOC assessments when CW-1 was shadowing RNs. I further believe that KATZ admitted that this cover story was false. The transcript of this excerpt is as follows:

> KATZ: … I will maintain the exact same thing. There was one SOC and I said she told me she's practicing to be an RN so we let her do a shadow.
>
> CW-1: But I didn't tell you that.
>
> KATZ: I had to tell her that you were shadowing. I told her you—
>
> CW-1: So it was a lie.
>
> KATZ: I said that you were planning to be an RN. Aren't you taking the test for it?

67.    Based on my training, experience, and knowledge of this investigation, I believe that later in the conversation KATZ again admitted that the cover story was not true and KATZ committed to helping CW-1 cover up the fact that CW-1 had illegally conducted SOC assessments. During the conversation, CW-1 emphasized to KATZ that CW-1 never shadowed nurses, "…Veronica [KATZ] you know that's not true. That shit is not true. Like I'm tired of covering for everybody and no one is covering for my ass…." KATZ responded, "How am I not covering for you?"

68.    Based on my training, experience, and knowledge of this investigation, I believe that later in the conversation KATZ again admitted that her story about CW-1 completing SOC assessments only while shadowing RNs was not true. I further believe that KATZ told CW-1 that KATZ had explained to the site surveyor KATZ's false story that if CW-1 had signed an

SOC assessment CW-1 did so because CW-1 was shadowing a nurse.  The transcript of this excerpt is as follows:

> KATZ: I said if she signed it [the SOC assessment] it's because she was shadowing a nurse.
>
> CW-1: But that's not true.
>
> KATZ: Ok.
>
> CW-1: So.
>
> KATZ: So what would you rather have me say?

69.     Based on my training, experience, and knowledge of this investigation, I believe that during the recorded conversation, KATZ and CW-1 called HERRERA to discuss how HERRERA had failed to remove CW-1's name from at least one SOC assessments sent for billing.  I believe that during this portion of the conversation, KATZ and HERRERA admitted that CW-1 had conducted SOC assessments and that HERRERA and KATZ had agreed to remove CW-1's name from the corresponding electronic medical records, and that at least one SOC had been sent for billing with CW-1's name still on it.  I further believe that HERRERA and KATZ had previously reviewed ("pulled") patient medical records submitted for billing to determine whether any of those medical records contained CW-1's name.  HERRERA stated that "only three" medical records submitted for billing contained CW-1's name.  HERRERA explained that when CW-1's name was removed from medical records prior to those records being submitted for billing CW-1's name would no longer appear in the HealthNow medical records for that patient.  Accordingly, I believe that in this conversation HERRERA and KATZ are discussing how they had previously removed CW-1's name from patient medical records because they knew CW-1 was not permitted to provide the treatment that she had in fact provided and HERRERA and KATZ were seeking to hide their improper billing practices from Medicare.  The transcript of this excerpt is as follows:

KATZ: Hey Vennesa [HERRERA]…. Can you explain how you billed a patient with [CW-1's] name on it?

HERRERA: Can I explain?

KATZ: …. [W]hy would you allow for her name to be on a chart when you billed. Like …  how did that get through. Because we promised a hundred times over that that would never ever happen. So why was her name on any chart?

HERRERA: Um, well I know when I bill I don't look at who name is in there. I just look for insurance….

KATZ: So my-- what I been saying, and I don't know if this is true or not, but I feel like did-- is it possible whoever plotted it accidentally plotted the wrong type of visit under [CW-1], it ended up in [CW-1's] hotbox, and [he/she] accidentally signed that…

HERRERA: Filled it out.

KATZ: Filled out.

HERRERA: Yeah.

KATZ: Or just signed off on it. Just because sometimes it just says signature needed. Like pending signature. Is it possible that she just signed it and she should have never signed it. But someone plotted it and then it was just marked complete. Therefore you just go ahead and submit it to ex, you export to billing. Is that possible?

HERRERA: That's definitely … possible. Yeah.

\* \* \*

KATZ: Is there any chance at all that there could be more SOCs besides those three that have her name on it?

HERRERA: Um. It's possible, but if…. I mean. I don't know. I mean I guess it's poss-- I mean anything's possible. I just couldn't pull them up before….

\* \* \*

KATZ: I told [CW-1] we did a full report and had to pull up everything. And those are the only three that pulled up. Now you're saying it's possible…. [CW-1] thinks that our stories are all fucking whacked out. Did you or did you not pull up the report of every single SOC to p-- see if there's any other names that [CW-1]--

HERRERA: Yeah, but the thing is if the name was changed, it's not going to pull up. So that's why I only pulled up three.

\*\*\*

CW-1: So if it [the electronic medical record] was changed it would not show my name? There's no like … record in Kinnsor [the electronic medical records database] that … I touched it though?

HERRERA: if it was changed from your name to something else, then it wouldn't pull up right now.

70.     Based on my training, experience, and knowledge of this investigation, I believe that in the excerpt above, HERRERA and KATZ acknowledge that they manipulated electronic medical records by changing the names of the medical professionals who provided care.  I further believe that HERRERA and KATZ acknowledged that they manipulated medical records associated with medical care provided by CW-1.

## Audit of Medicare Billing Records

71.     I understand that CMS contracts with Qlarant, among other companies, to receive, adjudicate, process, and pay Medicare claims, including claims for home health services.  CMS also contracts with Qlarant to serve as a Unified Program Integrity Contractor (UPIC).  UPICs investigate fraud, waste, and abuse in Medicare.  A UPIC such as Qlarant may review Medicare claims data as part of an investigation to ensure Medicare payments are only for services that meet Medicare coverage and medical necessity requirements.

72.     In the spring of 2020, the Investigating Agencies requested that Qlarant audit Medicare billing information for approximately 14 HealthNow patients.  Qlarant analysts reviewed the selected patient medical records.  Based on that review of 14 patients, a limited subset of the total number of HealthNow patients, Qlarant analysts concluded that Medicare paid HealthNow approximately $124,733.89 based on fraudulent HealthNow billing.

## V.   Types of Evidence Sought from the Target Locations

73.     Based on my training and experience, including experience investigating fraud schemes, there is probable cause to believe that certain electronic and paper documents and evidence may be found in the **Target Locations**. For the medical records in the names of the stolen identities, there are likely records of those in both paper and electronic format.  As previously mentioned, surveyors were present at **Target Location-1** conducting audits on HealthNow's records.  Information gathered from both the surveyors' notes and from interviews of several employees indicates that HeatlhNow stores patient records at **Target Location-1**, which were instrumental in the commission of these violations.  Furthermore, based on conversations with various persons who interviewed at HealthNow, it is reasonable to believe that HealthNow stores employee application packets, both electronically and paper copies, at **Target Location-1**.  I believe such documents will provide evidence of identity theft and other illicit activities related to the healthcare fraud scheme.

74.     Additionally, based on numerous interviews with HealthNow employees, I have learned that HealthNow employees have the ability to remotely log into the Kinnser software system to complete electronic medical records.  Based on my training, experience, and knowledge of the Kinnser software system used by HealthNow, I believe KATZ has the ability to remotely log-into the Kinnser software system from a computer or smart phone in order to manipulate medical records.  Based on my training and experience, it is common place to store personal electronic devices such as laptops, tablets, or cellular phones at a subject's place or residence and therefore I believe there is a reasonable belief that these items will be found at **Target Location-2**.

75.     Similarly, it is reasonable to believe that the owner of a business such as HealthNow would keep documents related to that business at their place of residence, such as **Target Location-2**.  These documents could include incorporation records, personnel files, or patient records and may exist in either electronic or paper form.

76.     Based on my training and experience, I also believe that participants in fraud

schemes as described above often communicate with other participants. Specifically, the Investigating Agencies have interviewed a number of HealthNow employees and associates who have stated they communicated with either KATZ and/or HERRERA via text messages or phone calls. The presence of these communications at the **Target Locations** could constitute evidence of the crimes alleged.

77.     Based on my experience in investigating fraud schemes such as described above, I have learned that the source and destination of funds fraudulently obtained can be relevant evidence regarding the schemes because this type of evidence can show, among other things, the access and control of the relevant accounts through which the funds flowed, the participants in the scheme, efforts to conceal the scheme, and the proceeds of the scheme itself. Also based on my training and experience, I know that financial records, in both paper and electronic form, are often retained for long periods of time and that in this case there is probable cause to believe that the Target Locations will contain records for relevant bank and other financial accounts.

### Roles of Computers and Digital Devices in the Conspiracy

78.     Based on my training and experience, I believe that computer equipment and/or electronic/digital devices (collectively, "digital devices") were used in furtherance of the above-described conspiracy, to wit: 1) manipulate medical records for the purpose of defrauding Medicare and deceiving regulatory agencies, and 2) to communicate with other conspirators. I respectfully submit that there is probable cause to believe that the digital devices currently located at the **Target Locations** will contain evidence of fruits and instrumentalities of this conspiracy.

79.     Although the conduct that I am investigating occurred from at least 2017, I know based on my training and experience that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a home computer,

36

the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten.

80.     In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer use habits. This application seeks permission to search for and seize evidence of the crimes described above stored on digital devices, as well as any digital devices that constitute fruits and instrumentalities of the crimes. Searches of digital devices and seizure of any data will comport with the protocol set forth in Attachment C, which is hereby incorporated by reference.

81.     Based upon my conversations with other law enforcement personnel and in my experience and training, I know that computers and other electronic equipment, including cell phones and smart phones, are often used to facilitate and maintain records in complex fraud schemes.

82.     Based upon my training, experience, and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices, including hard disk drives, floppy disks, compact disks, magnetic tapes and memory chips. Some of these devices can be smaller than a thumbnail and can take several forms, including thumb drives, secure digital media used in phones and cameras, personal music devices, and similar items.

83.     Based upon my training and experience, and information related to me by agents

37

and others involved in the forensic examination of computers and digital devices, I know that computers and digital devices are often used to store information, very much the same way paper, ledgers, files and file cabinets are used to store information. I know that it is common today for businesses, including illegal ones, to utilize computers to conduct their business and to store information related thereto. I also know that it is common for individuals to have personal computers and to use these computers to conduct their personal affairs, their business affairs, and to store information related thereto.

84.     Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that a forensic image is an exact physical copy of a data storage device. A forensic image captures all data on the subject media without viewing or changing the data in any way. Absent unusual circumstances, it is essential that a forensic image be obtained prior to conducting any search of data for information subject to seizure pursuant to the warrant. I also know that during the search of the premises it is not always possible to create a forensic image of or search digital devices or media for data. I also know that it is frequently necessary to remove digital devices or media for later laboratory evaluation off-site under controlled circumstances. This is true for a number of reasons, including the following:

85.     Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. Because there are so many different types of digital devices and software in use today, it is difficult to anticipate all of the necessary technical manuals, specialized equipment, and specific expertise necessary to conduct a thorough search of the media to ensure that the data will be preserved and evaluated in a useful manner.

86.     Searching digital devices can require the use of precise, scientific procedures designed to maintain the integrity of the evidence. The recovery of such data may require the use of special software and procedures, such as those used in a law enforcement laboratory.

87.     The volume of data stored on many digital devices is typically so large that it will be highly impractical to search for data during the execution of the physical search of the

premises. Storage devices capable of storing 500 gigabytes of data are now common in desktop computers. It can take several hours, or even days, to image a single hard drive. The larger the drive, the longer it takes. Depending upon the number and size of the devices, the length of time that agents must remain onsite to image and examine digital devices can become impractical.

88.     Because digital data may be vulnerable to inadvertent modification or destruction, a controlled environment, such as a law enforcement laboratory, may be essential to conduct a complete and accurate analysis of the digital devices from which the data will be extracted. Software used in a laboratory setting can often reveal the true nature of data. Moreover, a computer forensic reviewer needs a substantial amount of time to extract and sort through data that is concealed or encrypted to determine whether it is evidence, contraband, or an instrumentality of a crime.

89.     Analyzing the contents of a computer or other electronic storage device, even without significant technical difficulties, can be very challenging, and a variety of search and analytical methods must be used. For example, searching by keywords, which is a limited text-based search, often yields thousands of hits, each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant hit does not end the review process. The computer may have stored information about the data at issue which may not be searchable text, such as: who created it; when and how it was created, downloaded, or copied; when it was last accessed; when it was last modified; when it was last printed; and when it was deleted. The relevance of this kind of data is often contextual. Furthermore, many common e-mail, database, and spreadsheet applications do not store data as searchable text, thereby necessitating additional search procedures. To determine who created, modified, copied, downloaded, transferred, communicated about, deleted, or printed data requires a search of events that occurred on the computer in the time periods surrounding activity regarding the relevant data. Information about which users logged in, whether users shared passwords, whether a computer was connected to other computers or networks, and whether the

users accessed or used other programs or services in the relevant time period, can help determine who was sitting at the keyboard.

90.     Searching digital devices can require the use of precise, scientific procedures designed to recover latent data. The recovery of such data may require the use of special software and procedures. Data that represents electronic files or remnants of such files can be recovered months or even years after it has been downloaded onto a hard drive, deleted, or viewed via the Internet. Even when such files have been deleted, data can be recovered months or years later using readily available forensic tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in space on the hard drive or other storage media that is not allocated to an active file. In addition, a computer's operating system may keep a record of deleted data in a swap or recovery file or in a program specifically designed to restore the computer's settings in the event of a system failure.

91.     This warrant seeks authority to seize contextual data, including evidence of how a digital device has been used, what it has been used for and who has used it. It can be very important in criminal cases to seek "attribution" data so that an event or communication can be associated with a person. Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, this authority is sought for a number of reasons:

A.  In some instances, the computer "writes" to storage media without the specific knowledge or permission of the user. Generally, data or files that have been received via the Internet are automatically downloaded into a temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to such data or files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve artifacts of electronic activity from a hard drive depends less on when the file was downloaded or viewed than on a particular user's

operating system, storage capacity, and computer usage. Logs of access to websites, file management/transfer programs, firewall permissions, and other data assist the examiner and investigators in creating a "picture" of what the computer was doing and how it was being used during the relevant time in question. Given the interrelationships of the data to various parts of the computer's operation, this information cannot be easily segregated.

B. Digital data on the hard drive that is not currently associated with any file may reveal evidence of a file that was once on the hard drive but has since been deleted or edited, or it could reveal a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail programs, and chat programs store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations (or on other devices).

C. Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be learned from the absence of particular data on a digital device. Specifically, the lack of computer security software, virus protection, malicious software, evidence of remote control by another computer system, or other programs or software may assist in identifying the user indirectly and may provide evidence excluding other causes for the presence or absence of the items sought by this application. Additionally, since computer drives may store artifacts from the installation of software that is no longer active, evidence of the historical presence of the kind of software and data described may have special significance in establishing timelines of usage, confirming

the identification of certain users, establishing a point of reference for usage and, in some cases, assisting in the identification of certain users. This data can be evidence of a crime, can indicate the identity of the user of the digital device, or can point toward the existence of evidence in other locations. Evidence of the absence of particular data on the drive is not generally capable of being segregated from the rest of the data on the drive.

92.     Based upon my training and experience, and information related to me by agents and others involved in the forensic examination of computers and digital devices, I know that, in order to search for data that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize, image, copy, and/or search the following items, subject to the procedures set forth in Attachment C and incorporated by reference herein:

A.  Any computer equipment or digital devices that are capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachment B;

B.  Any computer equipment or digital devices used to facilitate the transmission, creation, display, encoding, or storage of data, including word processing equipment, modems, docking stations, monitors, printers, plotters, encryption devices, and optical scanners that are capable of being used to commit or further the crimes outlined above, or to create, access, process, or store (evidence, contraband, fruits, or instrumentalities) of such crimes, as set forth in Attachment B;

C.  Any magnetic, electronic, or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD ROMs, CD Rs, CD RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, personal digital assistants, and cell phones capable of being used to commit or further the crimes outlined above, or to create, access, or store evidence, contraband, fruits, or instrumentalities of such crimes, as set forth in Attachment B;

D.  Any documentation, operating logs, and reference manuals regarding the operation of the computer equipment, storage devices, or software;

E.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

F.  Any physical keys, encryption devices, dongles, or similar physical items which are necessary to gain access to the computer equipment, storage devices, or data;

G.  Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices, or data;

H.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show the actual user(s) of the computers or digital devices during any time period in which the device was used to commit the crimes referenced above, including the web browser's history; temporary Internet files; cookies, bookmarked, or favorite web pages; e-mail addresses used from the computer; MAC IDs and/or Internet Protocol addresses used by the computer; e-mail, instant messages, and other electronic communications; address books; contact lists; records of social networking and online service usage; and software that would allow others to control the digital device such as viruses, Trojan horses, and other forms of malicious (or alternatively, the lack of software that may allow others the potential opportunity to control the digital device);

I.  All records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer or digital device; and all records, documents, programs, applications, or materials created, modified, or stored in any form, including in digital form, on any computer or digital device, that show contextual

information necessary to understand the evidence, contraband, fruits, or instrumentalities described in this attachment.

## CONCLUSION

93.     Based on the foregoing, I respectfully request that the Court issue: (1) criminal complaints and arrest warrants for KATZ and HERRERA for one count of conspiracy to commit health care fraud and one count of health care fraud, in violation of 18 USC §§ 1347 & 1349; and (2) warrants for **Target Location-1** and **Target Location-2**, described in Attachment A, and seize the items listed in Attachment B, attached hereto, that may constitute evidence, fruits and instrumentalities of said violation, pursuant to the protocols set forth in Attachment C and Attachment D.


_____/s_____

Paul E. Yahraus
Special Agent
Federal Bureau of Investigation


Sworn to and subscribed before me
this 4th day of November, 2020.

HON. LAUREL BEELER
United States Magistrate Judge

44